[Cite as *State v. Pardon*, 2022-Ohio-663.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                    :

      Plaintiff-Appellee,                    :                    No. 20AP-206
                                          (C.P.C. No. 18CR-769)

v.                                               :

                                          (REGULAR CALENDAR)

Anthony Pardon,                                  :

      Defendant-Appellant.                   :

---

D E C I S I O N

Rendered on March 8, 2022

---

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Seth L. Gilbert*, for appellee.  **Argued:** *Seth L. Gilbert.*

**On brief:** *Yeura Venters*, Franklin County Public Defender, and *Robert Essex*, for appellant. **Argued:** *Robert Essex.*

---

APPEAL from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Defendant-appellant, Anthony Pardon, appeals from a judgment of the Franklin County Court of Common Pleas convicting him of aggravated murder, kidnapping, rape, aggravated burglary, aggravated robbery, and associated specifications.  For the following reasons, we affirm the trial court judgment.

## I.     FACTS AND PROCEDURAL HISTORY

{¶ 2}   In January 2018, Rachael Anderson was found deceased inside of the closet of her Columbus area apartment.  In February 2018, a Franklin County jury indicted appellant on charges associated with Rachael's murder, including five counts of aggravated murder pursuant to R.C. 2903.01, one count of kidnapping pursuant to R.C. 2905.01, one count of rape pursuant to R.C. 2907.02, one count of aggravated burglary pursuant to

R.C. 2911.11, and one count of aggravated robbery pursuant to R.C. 2911.01. The counts included multiple repeat murder specifications, felony murder specifications, and repeat violent offender ("RVO") specifications, and one sexually violent predator specification. The specifications attached to the aggravated murder counts made appellant, if convicted, eligible for the death penalty.

{¶ 3}   Appellant entered a plea of not guilty, and the case proceeded to a jury trial held in February 2020. After voir dire but prior to opening statements, appellant's defense counsel brought to the trial court's attention that a witness subpoenaed by the defense, Anthony Sleet, had passed away. (Feb. 3, 2020 Tr. Vol. 1 at 235.) Defense counsel indicated that it would seek to admit, under exceptions to hearsay, an interview Sleet gave to detectives and videotapes of him using the victim's credit card. Defense counsel stated it would file a motion with the court to support its position and explained that Sleet's statement and videos would show Sleet was the first person to use the victim's credit card, he did not pick appellant out of the photo array as being the person who gave him her credit card, his description of the person who gave him the credit card did not fit appellant's appearance, and his description of the vehicle involved did not match the victim's vehicle. *Id.* at 239-40.

{¶ 4}   Appellee confirmed Sleet was deceased and remarked, "[t]he State would have called him if he's alive but since he's deceased we don't believe we can admit his statement because it would be hearsay not within the exception," but that defense counsel had indicated an intent to use Sleet's video. *Id.* at 238. Both parties stated they would further attempt to reach an agreement on the matter prior to opening statements.

{¶ 5}   The jury trial commenced February 4, 2020. Appellant appeared and was represented by counsel. Following opening statements, appellee proceeded with its case in chief, which is summarized as follows.

{¶ 6}   Rachael Anderson moved from Warren, Ohio to Columbus in 2017 and was employed with a funeral home. In January 2018, she lived alone in a two-story apartment on Allegheny Street on the east side of Columbus. Rachael was set to turn 24 at the end of the month, on Sunday, January 28, and her brother and some of her friends planned a birthday party for her. Rachael's friend Jonathan Kennedy and his then-wife, Tina, volunteered to host the party at their home on the west side of Columbus the evening before

her birthday, Saturday, January 27.  Rachael knew Jonathan from high school, and she was friends with his sister.  Jonathan, Tina, and Rachael would see each other often and were "very good" friends. (Feb. 4, 2020 Tr. Vol. 2 at 367.)

{¶ 7}    Rachael's younger brother, John Anderson, still lived in Warren and drove to Columbus to attend the birthday party and stay with Rachael for the weekend. He arrived on Friday, January 26.  That evening, Jonathan and Tina came to Rachael's apartment to hang out.  The next day, Rachael gave her brother her primary key to her apartment since she had to work during the day, and her only spare key was kept by Tina.  After Rachael returned from work, her birthday party at the Kennedy's residence took place on Saturday night as planned.  About eight people attended, including Rachael, John, Jonathan, and Tina.  At the party, the group drank alcohol and smoked marijuana. Part of the group, including Rachael, John, and Tina, went to a dance club while others in the group stayed behind.  At the end of the evening, Rachael and her brother stayed overnight at the Kennedy's residence.

{¶ 8}    The next morning, Sunday, January 28, Rachael and her brother returned to her apartment.  John testified that he stayed about 30 to 45 minutes before leaving at about 1:00 p.m. to drive back to Warren and sometime later communicated with Rachael about the key to her apartment, which he had not returned to her.  Jonathan Kennedy likewise testified that Rachael called and texted him on Sunday asking to retrieve her spare apartment key since her brother had returned home without giving her primary key back.  Jonathan stated that he and Tina arranged for Rachael to come pick the key up later that evening, after they returned from driving a party-attendee back to his home in Athens, Ohio.  Cell phone data analyzed by a Columbus police department digital forensic analyst showed Rachael called her brother John at 1:58 p.m., texted Jonathan Kennedy a minute later concerning her brother taking the key, and texted Jonathan again at 6:17 p.m. indicating that she would be heading over to pick up the spare key in twenty minutes.  Jonathan testified that Rachael came to their house between 5:30 and 6:30 p.m., stayed a little less than 15 minutes, and left with the spare key.

{¶ 9}    Cell phone records analyzed by a BCI criminal intelligence analyst and the phone data reviewed by the Columbus police department digital forensic analyst indicated Rachael's cell phone communications ceased on the evening of Sunday, January 28th.  Her

last incoming call, from her mother, occurred at 6:30 p.m. and lasted nearly ten minutes. Rachael did not communicate through her phone thereafter.

{¶ 10} On Monday, January 29, Rachael did not show up for work at the funeral home. Rachael's manager asked another employee, Trent Snider, to go to Rachael's apartment to check on her. Snider arrived a little after 12:00 p.m. After knocking on her door and receiving no answer, Snider asked the property manager to look inside of the apartment. The manager initially refused to enter the apartment, and Snider called the police. While waiting for the police, he looked through the windows of the apartment and saw a candle burning on a coffee table. Snider also observed Rachael's car in the parking lot, but parked around the corner from where she lived, not in front of her unit.

{¶ 11} The property manager eventually obtained permission to enter the apartment from Shawn Griggs, Rachael's former roommate who remained on the lease but no longer lived there. The manager testified that she used a key to open the locked apartment door, briefly looked around both floors of the two-story apartment, and blew out the candle. She did not see Rachael, broken glass, or anything out of the ordinary, but she testified that she had not looked in the bedroom closet. After the property manager returned without further information, Snider and the police left.

{¶ 12} Still concerned, Rachael's work manager then called Jonathan Kennedy. Jonathan testified that he went to Rachael's apartment, attempted to look in the windows, and tried both doors to the apartment, which were locked. Jonathan noted that Rachael's car was not parked in her usual spot in front of the apartment unit, but instead was around the corner. According to Jonathan, he tried unsuccessfully to reach Rachael on her cell phone, called Griggs (who Jonathan described as Rachael's former boyfriend), and then waived to a passing police officer for help. With Jonathan and the police present, the property manager again allowed access to the apartment. According to the property manager, she stood in the living room while Jonathan went upstairs; Jonathan testified he checked the first floor before heading upstairs. The property manager then heard Jonathan scream. Jonathan exited the apartment and told the police Rachael was in the upstairs bedroom closet.

{¶ 13} The Columbus police officer on the scene, Frank Sclafani, testified that Jonathan exited the apartment looking pale and "freaked out." (Tr. Vol. 2 at 448.) Officer

Sclafani entered the apartment and located Rachael's body in the bedroom closet. She appeared to him to be deceased and was "bound and gagged and there was something over her head as well as around her neck which was attached to the doorknob." *Id.* at 451. Columbus police detectives then arrived and called the Ohio Bureau of Criminal Investigation ("BCI") for assistance in processing the scene. BCI agents responded that evening.

{¶ 14} According to BCI agent Joshua Durst, there were no signs of forced entry at either the front or back doors. On the first floor, no blood was observed. In the living room, a purse was lying on the floor and appeared to have been dumped out. An Arby's receipt from January 28 at 7:32 (a.m. or p.m. was illegible) was recovered, as well as Rachael's driver's license. A cup from Arby's, a french fry box, and an opened ketchup packet were also recovered from the living room, as well as a cell phone, a laptop computer, water bottle, cigarette and cigar butts, and a glass smoking pipe. No cash or credit cards were recovered.

{¶ 15} Durst proceeded upstairs and located Rachael lying by a pillow in the upstairs bedroom closet. In the bedroom, Durst observed and documented a blood saturation stain at the foot of the bed, a cut and knotted steam iron cord with what appeared to be hair and blood on it, and a cord to a heating blanket and some black leggings wrapped around the exterior knobs of the bedroom closet. The heating blanket cord extended into the closet and was wrapped tightly around Rachael's neck and knotted. Rachael was in a "hog-tie[d]" position with her ankles and wrists intricately bound with a hair dryer cord, a curling iron cord, and window blind cords determined to come from the bedroom blinds. (Feb. 5, 2020 Tr. Vol. 3 at 584.) She had black material stuffed into her mouth, a t-shirt covering her head like a hood, and a blanket wrapped around her. She wore a tank top, but no clothes were present from her waist down. Black underwear was recovered underneath her body. Once the cord bindings and head coverings were removed, BCI agents and the coroner's investigator observed a stab wound at the back of her neck at the base of her skull. According to the coroner's report and testimony, the cause of Rachael's death was a stab wound to the head and neck and ligature strangulation. (Feb. 11, 2020 Tr. Vol. 6 at 1407-08; State's Ex. V, Coroner's Report at 1.)

{¶ 16} BCI agents dusted the scene for fingerprints, and took swabs of Rachael's body, the cords used, and various surfaces and items in the apartment and Rachael's car in

an attempt to find "touch DNA." (Tr. Vol. 3 at 570.) Agents also discovered a blood stain leading from the bottom of the bed to the closet. Rachael's mother, while cleaning out boxes of items taken from Rachael's apartment, discovered and turned over to police a 9-inch knife covered in blood and hair. Agent Durst testified the knife is consistent with and the same manufacturer as knives observed in Rachael's apartment. Neither the key to Rachael's apartment nor her car keys were ever recovered.

{¶ 17} Because Rachael's debit card was missing, detective Hughes contacted her bank and was able to pinpoint locations her debit card was used on and after Sunday, January 28th and obtain surveillance footage from those locations. Bank records indicated Rachael's debit card was used on January 28th at 9:43 p.m. at Food Mart on East Main Street, which is within a mile or two from her apartment. Surveillance video footage from Food Mart shows Rachael's car in the parking lot and a man exit the passenger side of the car, go inside to an ATM, and then return. Another person's hand can be viewed in the driver's side of the car, but that person never exits. Rachael's debit card is used several more times that evening with the same pattern: a man exiting the car from the passenger side of Rachael's car, using either an ATM or making a purchase, and the driver never exiting the car.

{¶ 18} According to detective Hughes, a store clerk identified the man exiting the passenger side of the vehicle as Anthony Sleet, a vagrant who frequented the store's parking lot. When Sleet next appeared in the store's lot, the clerk called the detective, and patrol officers brought Sleet in for questioning at police headquarters on February 6, 2018. Detective Hughes conducted the interview with Sleet, which was recorded. The parties' stipulation regarding the interview and defense counsel's decision to not object to the playing of a portion of the interview was stated for the record, as follows:

> [APPELLEE]: Your Honor, at this time, we would ask that you read the stipulation for the jury.
>
> THE COURT: All right. Thank you. Again, ladies and gentlemen, this is a stipulation by the parties. The stipulation reads: The parties agree and stipulate that State's Exhibit X, the video recording of Anthony Sleet's interview with Detective Hughes has been edited for time purposes only.
>
> * * *

[APPELLEE]: Your Honor, at this time we would ask permission to play the portion of Mr. Sleet's interview which the parties have agreed on.

THE COURT: Any objection?

[DEFENSE COUNSEL]: No objection, Your Honor.

(Feb. 6, 2020 Tr. [Vol. 4] at 780-82. *See also* Stips. at 2.)

{¶ 19} The interview was then played in open court. *Id*. at 782-833. In the interview, Sleet stated that on the night of Sunday, January 28, 2018 he was panhandling outside of a store on Main Street on the east side of Columbus when a man came out of the store, engaged with him, and proposed he help access money from a debit card. Sleet asserted he had never met the man before. Sleet estimated the man was in his mid-30s or early 40s, or perhaps younger, stood 5'7 or 5'8 tall, and had dark-skin, slanted eyes, fat cheeks, short hair, a stocky frame, and a slightly southern accent. Sleet described the car the man was driving as a little, green, four-door station wagon-type of car. According to Sleet, the man explained he had a falling out with his girlfriend, who was trying to take his money, and that Sleet could help him by getting money from her debit card. The man knew the debit card pin. The man promised Sleet a hotel room for the night if he helped him, and Sleet, who was homeless, agreed. Sleet told detectives that he attempted to get $2000 from an ATM using the debit card but was only successful in getting $40. The man suggested they try again at other locations, and Sleet said they then tried a nearby Food Mart. In all, Sleet believed he was successful in getting around $400 and some cigarettes and other items using the debit card. The man never got Sleet a hotel room, but instead dropped him back off at the original store where he had been panhandling. Sleet denied he went anywhere with the man other than stores or banks. He was cooperative with police and agreed to submit his own DNA.

{¶ 20} During the interview, Sleet was shown a photo array administered by another detective unassociated with the case, and Sleet selected a photo that he thought "looks like him." *Id*. at 821. The form preceding the photo array signed by Sleet states, "#1 appears to be the person that drove the car." (State's Ex. P at 1.) Appellant's photo was not included in the array. Detective Hughes testified that once appellant was identified as a suspect, he tried to track down Sleet to administer another photo array, but Sleet could not be found. Detective Hughes eventually learned Sleet had passed away in September or October 2018.

{¶ 21} Defense counsel cross-examined detective Hughes about the Anthony Sleet interview, drawing attention to Sleet's description of the man who gave him Rachael's debit card, the extended amount of time Sleet and the driver of the vehicle were together during the evening of Rachael's murder, and the detective not obtaining more video that may have shown the man with Sleet. (Tr. [Vol. 4] at 922-927). Defense counsel also questioned detective Hughes about not promptly getting in contact with Sleet after arresting appellant. *Id.* at 939-40.

{¶ 22} After discussing the Sleet interview, detective Hughes testified that Rachael's debit card continued to be used throughout Columbus in the days after Rachael was discovered murdered. On the afternoon of Monday, January 29, her debit card was used on the north side of Columbus at Fair Food Mart on Cleveland Avenue. According to detective Hughes, the store is within walking distance of the residence of appellant's sister, where appellant was known to stay. The surveillance video shows a man with his face concealed using the debit card at an ATM. Rachael's debit card is used that same day a few miles north on Cleveland Avenue at Citi Trends, at the DSW at Easton, on the west side of Columbus at a Kroger, and at Hollywood Casino. The exterior and cashier surveillance videos from each store location shows a man and a woman, or just a woman, at the stores at times matching Rachael's bank records. Rachael's debit card was used two more days, Tuesday, January 30th and Thursday, February 1st, at the Fine Fair Food Mart on Cleveland Avenue near the residence of appellant's sister and at a market just east of downtown Columbus. The surveillance videos show a man with his face partially concealed accessing ATMs.

{¶ 23} Detective Hughes testified appellant's name was given to him as a possible lead by the crime laboratory. Appellant was taken into custody as he was leaving his sister's residence and getting into a car. Agent Durst was contacted to conduct a search of the sister's residence, which yielded the recovery of clothing with tags from Citi Trends and two casino receipts. The car appellant was in when he was arrested was also searched; agent Durst documented a baseball hat and gloves that looked consistent with the hat and gloves worn by the man in the store surveillance videos, clothing with tags, a cell phone, a knife, and an air pistol that agent Durst explained is not technically a firearm although it looks like one.

{¶ 24} Appellant's sister, Deborah Pardon, cooperated with detectives and was called to testify by appellee. Deborah verified that appellant would stay at her Linden area residence from time to time and would occasionally drive her blue or green four door Hyundai Accent or their mom's blue Toyota Corolla. Deborah testified that appellant would also stay at the apartment of his girlfriend, Bernita Anderson, who lived on Allegheny Street in the same complex as Rachael. As confirmed by detectives, the back door of Rachael's apartment can be seen from the back of Bernita's apartment. Bernita's daughter, Allison Gamble, had additionally lived in Rachael's complex in the unit directly next door to Rachael until moving in December 2017.

{¶ 25} Deborah admitted to improperly using the debit card at Citi Trends, Easton, Kroger, and the casino, and identified herself and appellant as the man and woman in the store surveillance videos connected with the use of Rachael's debit card. According to Deborah, appellant gave her the card and a pin number, and she saw the name "Anderson" and assumed it was Bernita Anderson's card. (Feb. 10, 2020 Tr. Vol. 5 at 994.) Deborah also admitted she had a lengthy criminal history and agreed that appellee advised her that she would not be charged with crimes for using the debit card if she was truthful about what had happened.

{¶ 26} Analysis of appellant's cell phone by BCI and the Columbus police department digital forensics team showed appellant's cell phone was located in an area encompassing Rachael's apartment on the evening of Sunday, January 28th and near the locations where her debit card was used that night and the following days. From 7:45 until 9:14 p.m. on Sunday, January 28th, appellant's cell phone was "pinging off of" the cell phone tower closest to Rachael's (and Bernita's) apartments. *Id.* at 1057. Geolocation information obtained from Google likewise showed that, between 7:59 p.m. and 9:25 p.m., 35 cell tower, Wi-Fi, and GPS "hits" place appellant's cell phone near Rachael's apartment. *Id.* at 1143-45.

{¶ 27} Google geolocation data then places appellant's phone near James Road and East Broad Street at 9:30 p.m. Sunday evening and near several of the locations—Food Mart, two banks on East Main Street, a carry out, Kroger, Fine Fair Food Mart, Citi Trends, DSW, the east-side market—where Rachael's debit card was used during the next several hours and days. Appellant's cell phone records show outgoing phone calls on Monday,

January 29 near Citi Trends and DSW at the times Rachael's debit card was used at those locations, and his cell phone can be traced to the towers located in those areas at those times. On Tuesday, January 30th, appellant's cell phone is associated with the cell phone tower nearest to the Fine Fair Food Mart and his sister's home. On Thursday, February 1st, appellant's phone is associated with the tower near Rachael's apartment in the morning hours and later pings off a tower near the near east side market where Rachael's debit card was utilized. On cross-examination, the BCI analyst agreed that the data did not show who was in possession of the cell phone analyzed and agreed that if appellant was staying with Bernita, his cell phone may have used the same cell tower shown in the data.

{¶ 28} A forensic scientist at the Columbus Police Crime Laboratory testified that appellant's DNA was included on swabs taken from Rachael's body and certain cords used to constrain her. (Feb. 11, 2020 Tr. Vol. 6 at 1303-04.) Specifically, for both factions of the vaginal swab, the DNA analysis revealed a "Y-STR" profile, from a single-source, which was consistent with appellant's DNA profile. *Id.* at 1280, 1283. The forensic scientist explained that in the context of reviewing Y-STR profiles, which focuses on the Y (male) chromosome, her statement that the DNA profile found on the vaginal swab was "consistent" with appellant's DNA meant the group of people "is Anthony Pardon, his brother from the same father, his father, paternal grandfather" and did not extend to "a group of random men." *Id.* at 1360. For the swab of Rachael's inner thighs and pelvic area, the Y-STR profile was consistent with a mixture of at least two individuals, and appellant could not be excluded as the major contributor. *Id.* at 1272-74. Appellant likewise could not be excluded as the major contributor regarding the Y-STR profile from the right wrist swab, which was determined to be consistent with a mixture of at least three individuals. *Id.* at 1283-84.

{¶ 29} The DNA profile obtained from the swabs from the curling iron and cord was interpreted as being a mixture of three individuals, with it being "at least 20.5 billion times more likely if the evidentiary profile originated from Rachael Anderson, Anthony Pardon and one unknown unrelated individual than if it originated from Rachael Anderson and two unknown unrelated individuals." *Id.* at 1255-57. Similarly, for the hair dryer and cord, it "is at least 14.5 billion times more likely if the evidentiary profile originated from Rachael Anderson, Anthony Pardon and one unknown, unrelated individual than if it originated from Rachael Anderson and two unknown, unrelated individuals." *Id.* at 1261. Appellant's

DNA was not found in the swabs taken from the heating blanket cord and a steam iron cord. Anthony Sleet's DNA was not found on any of the swabs, Jonathan's DNA was found on a Pepsi can and a pipe taken from the first floor of the apartment, and John's DNA was found on a bathrobe and in the upstairs bathroom. The swabs taken from Rachael's car did not evidence either appellant's or Sleet's DNA.

{¶ 30} As a part of the investigation, police detectives interviewed Rachael's brother, John. John testified to giving the detectives Jonathan Kennedy's name as a possible suspect due to a conversation he had with Rachael about two weeks prior to her birthday party where Rachael discussed a falling-out between her and Jonathan, her feeling "sexual vibes" from him during an LSD trip, Jonathan calling her a "virus," and Rachael being afraid of him. (Tr. Vol. 3 at 523-26.) John testified that Rachael did not mention her concerns about Jonathan again to him, and that she acted like "nothing ever happened" during the birthday party weekend and everything seemed friendly and fine between them. *Id.* at 537. Detective Hughes testified that both Jonathan and John were swabbed for DNA and that neither of the men's DNA was found on Rachael's body or the bindings. Jonathan provided an alibi, asserting he was with Tina the evening Rachael was murdered. Rachael's brother John also provided the detectives with the name of Rachael's ex-boyfriend and a man in the apartment complex that she had complained about as possible suspects. Both men were determined to not have been in Columbus when Rachael was murdered.

{¶ 31} The state's exhibits, including Sleet's photo array selection and the "agreed upon" portions of the Sleet interview, were admitted without objection by defense counsel, and the state rested its case in chief. (Tr. Vol. 6 at 1440.) Defense counsel moved the court for acquittal on all counts and specifications under Crim.R. 29; the trial court denied the motion. The defense then rested its case, and the parties proceeded to closing arguments. During closing arguments, defense counsel referenced Sleet's interview and called the jury's attention to Sleet's insistence that the initial conversation with the man who gave him the credit card was on video and the detective's failure to obtain that video, which "would [have] be[en] helpful" to appellant. (Feb. 12-13, 2020 Tr. Vol. 7 at 1512.)

{¶ 32} Following closing arguments and instructions from the court, the jury returned guilty verdicts on all counts in the indictment and the related specifications. As a capital case, the matter was scheduled for a hearing on the penalty phase. In the penalty

phase, the jury indicated it was deadlocked as to whether the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt to impose the death penalty, but unanimously found appellant should be sentenced to life imprisonment without the possibility of parole on the aggravated murder counts. A sentencing hearing was then held in March 2020. The trial court merged the aggravated murder counts for the purposes of sentencing, and the state elected to proceed on the first count of aggravated murder. The trial court sentenced appellant to life without the possibility of parole on both the aggravated murder count and the rape count (with a sexually violent predator finding), and 11 years on each of the remaining counts of aggravated burglary, kidnapping, aggravated robbery plus mandatory consecutive ten years imprisonment for the RVO specifications attached to those counts. The trial court ran the sentences consecutively to each other, resulting in a combined total sentence of two life sentences plus an additional 63 years.

{¶ 33} Appellant filed a timely appeal.

## II.     ASSIGNMENTS OF ERROR

{¶ 34} Appellant submits two assignments of error for our review:

> First Assignment of Error: The trial court committed reversible error by permitting the prosecution to play, without objection, the statement of Anthony Sleet who was deceased at the time of trial in violation of Ohio Evid.R. 804(B)(5) and the appellant's right to confrontation as guaranteed by the United States and Ohio Constitutions.

> Second Assignment of Error: The appellant was denied the effective assistance of counsel based on failure to object to Anthony Sleet's highly prejudicial statement in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

## III.    ANALYSIS

{¶ 35} With his two assignments of error, appellant asserts his defense counsel was ineffective by failing to object to the Anthony Sleet interview being played, and the trial court committed reversible error in permitting that interview to be played regardless of the lack of objection. Having reviewed each of these matters, we find appellant's contentions to lack merit on the record of this case.

**A.    Defense counsel was not ineffective for failing to object to the admission of the Sleet interview**

{¶ 36} For clarity of discussion and analysis, we begin by reviewing appellant's assertion of ineffective assistance of counsel before proceeding to review whether the trial court erred in admitting Sleet's interview. "In order to prevail on an ineffective-assistance-of-counsel claim, a defendant must prove that counsel's performance was deficient and that the defendant was prejudiced by counsel's deficient performance." *State v. Davis*, 159 Ohio St.3d 31, 2020-Ohio-309, ¶ 10, citing *State v. Bradley*, 42 Ohio St.3d 136, 141-42 (1989) and *Strickland v. Washington*, 466 U.S. 668 (1984). "Thus, the defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that there exists a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *Davis* at ¶ 10, citing *Bradley* at paragraphs two and three of the syllabus. " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Bradley* at 142, quoting *Strickland* at 694. *See also Davis* at ¶ 15 (noting the prejudice prong is not met when "the defendant was simply harmed by counsel's alleged deficient performance.")

{¶ 37} In his assigned error, appellant contends his defense counsel was ineffective for failing to object to the admission of the interview between detectives and Sleet, who passed away prior to trial. In appellant's view, "[t]here can be no valid reason for not objecting, much less agreeing" to admit the Sleet interview. (Appellant's Brief at 35.) Appellant believes Sleet's statement was highly prejudicial as it corroborated cell phone and geolocation evidence presented by appellee that showed appellant "was driving Rachael Anderson's car shortly after her murder" and that the value of admitting the interview was "minimal" and largely unexplored by defense counsel. (Appellant's Brief at 36.)

{¶ 38} Appellee, quoting *Harrington v. Richter*, 562 U.S. 86, 105 (2011) and *Strickland* at 689-90, cautions that the *Strickland* standard must be applied "with scrupulous care" when an appellant's claim of ineffective assistance of counsel is based on the lack of an objection. (Appellee's Brief at 27.) Appellee contends defense counsel had legitimate strategic reasons for not objecting to, and even agreeing to, the admission of Sleet's interview and that admission of the interview did not add more to what had already been established by the geolocation data and other evidence.

{¶ 39} We agree with appellee. To establish deficient performance, appellant must "show that counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment." *State v. Lee*, 10th Dist. No. 17AP-908, 2018-Ohio-3957, ¶ 34. A claim of deficient performance "must overcome the strong presumption that counsel's performance was adequate or that counsel's actions might be considered sound trial strategy." *Id.* "Debatable trial tactics generally do not constitute ineffective assistance of counsel." *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, ¶ 116.

{¶ 40} Here, the record shows defense counsel deliberately, as a trial strategy, did not object to admission of the Sleet interview. Defense counsel's questioning of appellee's witnesses and closing argument sought to erode certainty in the detectives' investigatory process and frame their conclusions as hasty and incomplete in an attempt to place reasonable doubt in the minds of the jurors. The Sleet interview added value to this strategy. In the interview, Sleet described the man who gave him Rachael's debit card and drove her car to the various ATM locations as younger than appellant. Likewise, in the photo array presented by detectives, Sleet identified another person as the driver of the car. Furthermore, Sleet insisted the man who gave him the debit card could likely be seen during their initial conversation, and defense counsel drew attention to the detective's failure to obtain video of this encounter. Sleet also admitted to having a recent run-in with the law and to being the person in the video using Rachael's debit card shortly after her murder, possibly raising questions about Sleet's involvement in the murder himself and his motive to lie about how he obtained the debit card. Moreover, defense counsel could have reasonably believed the Sleet interview would not significantly hurt appellant, since other evidence—the cell phone records, Wi-Fi, and geolocation data as well as his sister's testimony—connected appellant to the use of Rachael's debit card. On this record, appellant has not shown his defense counsel's performance was deficient in failing to object to the admission of the Sleet interview.

{¶ 41} Even if defense counsel's failure to object to the admission of the Sleet interview constituted a deficient performance, appellant has additionally not demonstrated a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. Even without the Sleet interview, the record in this case still showed appellant often stayed at Rachael's apartment complex in a unit near to Rachael's residence,

appellant's cell phone was located near Rachael's apartment during the time of her murder and near locations Rachael's debit card was used during the evening of her murder, that appellant and his sister used Rachael's debit card in the days following her murder, and DNA evidence from certain bindings and body swabs implicated appellant. On this record, appellant has not established that he would have been prejudiced by counsel's alleged deficient performance. As a result, neither prong of *Strickland* is met in this case.

{¶ 42} Accordingly, the second assignment of error is overruled.

**B.      The trial court did not err by permitting the Sleet interview to be admitted**

{¶ 43} Appellant additionally contends the trial court committed reversible error by permitting the prosecution to play the police detective's interview with Sleet. He asserts doing so violated both Evid.R. 804(B)(5), which states a hearsay exception for statements made by a deceased person, and his constitutional confrontation clause rights.

{¶ 44} " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted" and is generally inadmissible. Evid.R. 801(C); Evid.R. 802. The hearsay exception specific to statements of a deceased person, Evid.R. 804(B)(5), generally pertains to cases where a deceased person's estate is involved.[1]

{¶ 45} "Although the hearsay rule (along with its exceptions) and the Confrontation Clause protect similar values, the United States Supreme Court has repeatedly noted that the two are not coextensive." *State v. Dever*, 64 Ohio St.3d 401, 415 (1992). The Confrontation Clause of the Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment provides, "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *." Likewise, Article I, Section 10 of the Ohio Constitution states that "[i]n any trial, in any court, the party accused shall be allowed * * * to meet the witnesses face to face * * *."

{¶ 46} The Confrontation Clause applies only to "testimonial statements," which "includes statements made under circumstances that would lead an objective witness to

---

[1] Under Evid.R. 804(B)(5), statements made by a deceased person may be admitted where the estate or personal representative of the decedent's estate is a party; the statement was made before the death; and the statement is offered to rebut testimony by an adverse party on a matter within the knowledge of the decedent.

reasonably believe that the statement would be available for use at a later trial." *State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, ¶ 212. *See also State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, ¶ 181 (stating a statement is testimonial "if it is made with a primary purpose of creating an out-of-court substitute for trial testimony.")   " '[A]dmission of an out-of-court statement of a witness who does not appear at trial is prohibited * * * if the statement is testimonial unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness.' " *Tench* at ¶ 210, quoting *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, ¶ 34, citing *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).

{¶ 47} In this case, appellant argues: the Sleet interview is inadmissible hearsay, which appellee acknowledged at trial; the interview is inadmissible testimonial evidence under the confrontation clause; and the trial court lacked discretion to admit the interview in these circumstances.  In appellant's view, this court should review these issues de novo since the trial court "violat[ed] a clear legal rule (the admission of hearsay evidence)." (Appellant's Brief at 26.)  Appellant cites to *State v. Wright*, 4th Dist. No. 16CA24, 2017-Ohio-9041, ¶ 25; *State v. Phillips*, 4th Dist. No. 18CA3832, 2018-Ohio-5432, ¶ 45; and *State v. Abdussatar*, 8th Dist. No. 86406, 2006-Ohio-803, ¶ 12 in support of his standard of review argument.

{¶ 48} Appellee counters that the invited-error doctrine precludes any review of this assigned error since defense counsel advocated for the admission of the Sleet interview and "affirmatively consented" to the admission of the interview, and the record shows the parties agreed to admit certain portions of the interview.  (Appellee's Brief at 19.)  Even if review of the alleged error is not precluded under the invited-error doctrine, appellee contends the lack of an objection to the admission of the interview requires plain error review, which appellant cannot demonstrate on this record.

{¶ 49} We agree with appellee that the trial court's admission of the Sleet interview does not warrant reversal in this case.  Initially, we note appellant concedes defense counsel did not object to appellee playing the Sleet interview and at one point states defense counsel "agree[ed] to" admit the Sleet interview.  (Appellant's Brief at 35.)  For reasons already explained in addressing the second assignment of error, defense counsel had legitimate strategic reasons to deliberately not challenge, or even to agree to, the admission of the Sleet

interview.  However, such a strategy—at minimum—precludes all but plain error review of the instant hearsay and confrontation clause issue on appeal.  *Tench* at ¶ 217 (finding the appellant waived all but plain error of the confrontation clause issue where he failed to object to the statements at trial); *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 191 ("Because McKelton did not raise hearsay and confrontation-clause objections at trial, he has waived all but plain error.")  *See* Crim.R. 52(B) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.")  Appellant's argument that de novo review applies is unconvincing: in addition to appellant's cited cases not being from this district, those cases did not involve the possible application of the plain error analysis due to the lack of an objection.

{¶ 50} To demonstrate plain error, an appellant "must show that (1) there was an error, (2) the error was 'plain,' i.e., obvious, and (3) the error affected substantial rights," meaning a reasonable probability that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims.  *Tench* at ¶ 217-18, citing *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68, and *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 22.  " ' A court recognizes plain error with the utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice."  *State v. Pilgrim*, 184 Ohio App.3d 675, 2009-Ohio-5357, ¶ 58 (10th Dist.).  In the instant case, appellant has not established plain error regarding the admission of the Sleet interview for two reasons.

{¶ 51} First, "[a]n assertion upon appeal, pursuant to Crim. R. 52(B), that evidence admitted without objection at trial was prejudicial to the defendant and should have been excluded, will not be entertained where the defendant had adequate legal representation at trial, and where it is apparent from the record that the failure to object was a deliberate tactic of counsel." *State v. Wolery*, 46 Ohio St.2d 316, 316 (1976).  Here, as explained in reference to the second assignment of error, it is apparent from the record that defense counsel's failure to object was a deliberate tactic.  Sleet was subpoenaed by both parties. Defense counsel initially expressed interest in admitting Sleet's interview despite Sleet having passed away and explained to the trial court how it could aid appellant's defense.  At trial, defense counsel did not object when appellee requested to play for the jury the portion of the interview "which the parties have agreed on" and again did not object to the admission of Sleet's photo array selection and the "agreed upon" portions of the Sleet

interview as part of appellee's exhibits. (Tr. Vol. 5 at 780-82, Tr., Vol. 6 at 1440.) Defense counsel further attempted to use points of the interview in favor of the defense during closing argument. Pursuant to *Wolery*, appellant cannot establish plain error on this record.

{¶ 52} Second, appellant has not demonstrated a reasonable probability the admission of Sleet's interview resulted in prejudice. The evidence connecting appellant to the charged crimes was overwhelming. As provided in more detail in the facts, the forensic scientist testified that appellant's DNA was included on swabs taken from Rachael's body and certain cords used to constrain her. (Tr. Vol. 6 at 1303-04.) The record also established that appellant often stayed at Rachael's apartment complex in a unit near to, and within view of, Rachael's residence. Cell phone and geolocation data placed appellant's cell phone near Rachael's apartment during the time of her murder, near locations Rachael's debit card was used during the evening of her murder, and near locations the debit card was used in the days following Rachael's murder. Appellant's sister confirmed appellant used Rachael's debit card and gave her the card to use as well. Viewing the record of the case as a whole, even had the trial court erred in admitting the Sleet interview, appellant has not demonstrated that error would have affected his substantial rights.

{¶ 53} Considering all the above, appellant has not demonstrated plain error due to the admission of the Sleet interview. Therefore, appellant's first assignment of error lacks merit.

{¶ 54} Accordingly, appellant's first assignment of error is overruled.

## IV. CONCLUSION

{¶ 55} Having overruled appellant's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

JAMISON and NELSON, JJ., concur.

NELSON, J., retired, of the Tenth Appellate District, assigned to active duty under the authority of the Ohio Constitution, Article IV, Section 6(C).

_____